# UNITED STATES DISTRICT COURT

for the
Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   MJ24-025 |
| 4 Persons, 5 Premises, and 2 Vehicles | ) ) ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

4 Persons, 5 Premises, and 2 Vehicles as described in Attachment A, incorporated herein by reference

located in the _____Western_____ District of _____Washington_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846 | distribution, possession with intent to distribute; conspiracy |
| 18 U.S.C. § 924(c) | possession of a firearm in furtherance of a drug trafficking crime |
| 18 U.S.C. §§ 1956, 1957 | money laundering |

The application is based on these facts:

☑   See Affidavit of Evan Leyva, continued on the attached sheet.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____  is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Evan Leyva, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:   01/19/2024

_____
*Judge's signature*

City and state:   Seattle, Washington

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

Attachment A

Persons, vehicles, and premises to be searched:

a.      The person of Mario James EARL (hereafter, "EARL"), born in 1978;

b.      The person of Elisa JOHNSON (hereafter, "JOHNSON"), born in 1990;

c.      The person of Maurice LYNCH (hereafter, "M. LYNCH"), born in 1975;

d.      The person of Turomne WASHINGTON (hereafter, "WASHINGTON"), born in 1989;

e.      11527 113th PL NE, Kirkland, Washington (hereafter, "Target Premise #1") is described as an approximately 0.1984 acre lot containing an approximately 1,380 sq ft, single-family home that is brown in color with the number 11527 clearly displayed over the garage door;

f.      5416 Rainier Ave S, Seattle, Washington, 98118 (hereafter, "Target Premise #2") is described as a single office space on the top floor and the furthest most right door of a multi-floor business building that sits on an approximately 0.1127 acre lot;

g.      A white Cadillac Escalade, bearing Washington state license plate CGG6626 (hereafter, the "White Escalade");

h.      A 2021 white Tesla, WIN: 5YJSA1E64MF44189,  bearing Washington license plate CFC9473 (hereafter, the "White Tesla");

i.      2016 S. 104th Street, Burien, Washington (hereafter, "Target Premise #3") is described as the upstairs unit of a two-story multi-family building. The target unit has a blue front door with a poster that states "BLACK LIVES MATTER" affixed to the front door. The building has the unit number "2016" on the outside of the front of the unit;

j.      802 S. 31st St, Renton, Washington (hereafter, "Target Premise #4") is described as an approximately 7,800 sq ft lot containing an approximately 2400 sq ft, 4 bedroom, 2.75 bathroom, single-family home that is gray in color with the number "802" clearly displayed to the left of the garage door; and,

k.      1838 E 34th Street, Tacoma, Washington (hereafter, "Target Premise #5") is described as an approximately 9,750 sq ft lot containing an approximately 1,238 sq ft, 3 bedroom, and 1 bathroom, single-family home that is white with a white front door and four windows on the front side of the house.

1

# ATTACHMENT B

2    The following items to be seized that constitute evidence, instrumentalities, or fruits of

3    violations of Title 21 U.S.C. §§ 841 and 846 (distribution, possession with intent to

4    distribute, and conspiracy to distribute and to possess with intent to distribute controlled

5    substances) as well as the related offenses under Title 18 U.S.C. § 924(c) (possession of a

6    firearm in furtherance of a drug trafficking crime) and §§ 1956 and 1957 (money

7    laundering) are as follows:

8

9    a.  Controlled substances, including cocaine

10   b.  Documents reflecting the purchase or sale of controlled substances, such as
        ledgers, customer lists, supplier lists, correspondence, contracts and agreements
11      between buyers and sellers, notations, logs, receipts, journals, books and/or other
12      papers noting the price, quantity or quality of controlled substances, or noting the
        person or location to or from whom controlled substances were obtained,
13      transferred, sold or distributed and/or indicating amounts due or owed on account
        or transactions, and any other form of ledger recordation, or papers relating to
14      drug trafficking or money laundering during the period of January 1, 2018 to the
15      present;

16   c.  Financial records reflecting illicitly obtained monies and/or other forms of assets
        acquired through the sales, trafficking, or distribution of controlled substances
17      from January 1, 2018 to the present, which include federal and state tax returns,
18      employment papers, banking records and pass books, account information,
        canceled checks, deposit records, income and expenditures records, property
19      acquisition records, money market accounts and/or similar accounts, records of
20      stocks and/or bonds purchased or exchanged; credit card records; records
        reflecting the rental of safe deposit boxes; safe deposit box keys; records reflecting
21      vehicles owned, purchased, sold or leased; insurance documents; and any other
22      documents recording or relating to the acquisition, conversion, movement,
        secreting, transfer and disbursement of currency and currency equivalents,
23      including any records identifying the source or receipt and disposition of such
        funds, such as Currency Transaction Reports (CTRs) and Forms 8300;
24
25   d.  United States Currency, foreign currency, and financial instruments, including but
        not limited storage devices, keys and seed phrases utilized to store, secure, and or
26      recreate digital currency and or wallets;

27

e.  Any and all business or financial records of businesses under the MCM Realty, LLC name or used to promote MCM Realty LLC;

f.  Any and all documents referring or relating to the purchase or sale of real estate properties during the period of January 1, 2016, to the present, including but not limited to purchase or sale agreements or offers; applications for property loans; property loan documents; escrow documents and payment coupons, books, or receipts; property tax documents; canceled checks or cashier check copies or receipts reflecting payment of loans or property tax bills;

g.  Any and documents relating to the rental of properties, including lease agreements and applications;

h.  Articles of personal property and documents tending to show payment, receipt, concealment, transfer, disposition of or movement of large amounts of money during the period of January 1, 2018, to the present, including bank account records; bank statements; safe deposit box keys or records; money containers; financial records or notes; ledger books; stock certificates; certificates of deposit, bonds or other financial instruments; vehicles; precious metals or jewelry; electronic equipment; or any wire transfer records, negotiated or unnegotiated checks, check stubs or receipts, traveler's checks, money orders, cashier's checks reflecting transactions involving $1,000 or more;

i.  Money counting machines, money wrappers, vacuum sealers and bags, work sheets, tally-sheets and ledger sheets reflecting or accounting for monies and/or controlled substances received, disbursed or exchanged, and to include monies obtained from the sale and/or trafficking of controlled substances; and other equipment and materials used for processing and storing drug proceeds or U.S. currency;

j.  Records, generated during the period of January 1, 2018, to the present, of off-site locations to store records, including safe deposit box keys, records and receipts and rental agreements for storage facilities;

k.  Records regarding notes payable and receivable, IOUs, and evidence of debts owed from the time period of January 1, 2018, to the present;

l.  Photographs or videos of conspirators, controlled substances, or of assets, including U.S. currency;

m.  Records, items and documents, from January 1, 2018, to the present, reflecting travel including but not limited to passports, airline tickets, receipts, or emails notating travel, vehicle rental receipts, credit card receipts, gas station receipts,

and restaurant receipts, canceled checks, maps and records of long-distance calls reflecting domestic and foreign travel;

n.    Any and all correspondence, work papers and notes related to the drug conspiracy;

o.    Security cameras, recordings therefrom, and items use with the security system, such as televisions;

p.    Electronic devices and storage media including laptop and desktop computers, cellular phones, tablet computers, hard drives, thumb drives, CDs, and DVDs (collectively, "electronic devices"), including Subscriber Identity Module ("SIM") cards and chargers associated with the devices, and the contents thereof, including:

   i.    Any and all stored communications, including, but not limited to voice calls, text messages, stored voice mail or other audio messages, recordings of incoming and outgoing calls, emails, all of which are stored or saved in the electronic devices and/or the SIM card associated with said electronic devices, that evidence the transportation, ordering, distribution, possession and sale of controlled substances, the collection of drug proceeds, and/or the connection to known and as yet unidentified co-conspirators;

   ii.   Photographs and videos that show the transportation, ordering, distribution, possession and sale of controlled substances, the collection of drug proceeds, and/or the connection to known and as yet unidentified co-conspirators;

   iii.  Calendar information, note pad, and other notes/records that evidence the transportation, ordering, distribution, possession and sale of controlled substances, the collection of drug proceeds, and/or the connection to known and as yet unidentified co-conspirators;

iv.    Phone directory, contacts, address and/or telephone books, and other records reflecting names, addresses (including email), telephone numbers, and/or the connection to known and as yet unidentified co-conspirators:

v.    Evidence of user attribution showing who used or owned the electronic devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history:

vi.    Location information that may show travel history and locations used to facilitate drug trafficking and money laundering

q.  Addresses and/or telephone books, rolodex indices and any papers or electronically stored data reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, sources of supply, and/or customers;

r.  Indicia, both digital and otherwise, of occupancy, residency, rental and/or ownership of the property, and other properties or assets, including, but not limited to, utility, telephone, cable, and other service provider bills, insurance records, cancelled checks, receipts, rental, purchase or lease agreements, and keys;

s.  Any and all secured and/or locked rooms, hidden rooms, safes, cabinets, boxes, etc. wherein documents and currency may be located;

t.  Financial statements/records, loan records, payment journals, signature cards, keys and/or other items/records identifying assets or evidencing legitimate income (or the lack thereof); general living expenses; the obtaining, secreting, transferring, and/or concealing of assets; and the obtaining secreting, transferring, concealing, and/or spending of money.

u.  Jewelry

As used above, the terms records, documents, programs, applications, or materials includes records, documents, programs, applications, or materials created, modified, or stored in any form.

During the execution of the search of the Subject Persons, Vehicles, or Premises described in Attachment A, if law enforcement encounters a smartphone or other

1   electronic device equipped with a biometric-unlock feature, and if law enforcement

2   reasonably suspects Mario James EARL, Elisa JOHNSON, Maurice LYNCH, and/or

3   Turomne WASHINGTON is a user of the device, then – for the purpose of attempting to

4   unlock the device in order to search the contents as authorized by this warrant – law

5   enforcement personnel are authorized to: (1) press or swipe the fingers (including

6   thumbs) of the individuals to the fingerprint scanner of the device; and/or (2) hold the

7   device in front of the face and open eyes of those same individuals and activate the facial,

8   iris, or retina recognition feature.

9          In pressing or swiping an individual's thumb or finger onto a device and in

10  holding a device in front of an individual's face and open eyes, law enforcement may not

11  use excessive force, as defined in *Graham v. Connor*, 490 U.S. 386 (1989); specifically,

12  law enforcement may use no more than objectively reasonable force in light of the facts

13  and circumstances confronting them.

## AFFIDAVIT OF SPECIAL AGENT EVAN LEYVA

STATE OF WASHINGTON          )
                             )      ss
COUNTY OF KING               )

I, Evan Leyva, Special Agent with the Drug Enforcement Administration ("DEA"), do depose and state the following:

### AFFIANT BACKGROUND

1.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I am a Special Agent with the DEA and have been so employed since March 2020. As a DEA Special Agent, I have received approximately four months of specialized training at the DEA Training Academy in Quantico, Virginia. This training focused on methods of unlawful drug trafficking; the means by which drug traffickers and/or manufacturers derive, launder, and conceal their profits from drug trafficking; the use of assets to facilitate unlawful drug trafficking activity; and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations. Since completion of the DEA Academy, I have been assigned to the DEA's Atlanta Division Office Enforcement Group One and have been so assigned since October 2020. Prior to my employment as a Special Agent with the DEA, I was employed as a Narcotics Investigator and Georgia Peace Officer with the Gwinnett County Police Department for over three years. During this time, I have arrested individuals who have been charged with trafficking, possession with intent to distribute, sale, and/or possession of illegal drugs, including marijuana. I have written and/or participated in the execution of search warrants resulting in the

1  seizure of marijuana, cocaine, methamphetamine, heroin, MDMA, prescription pills, and

2  other illegal narcotics.  These search warrants have also resulted in the seizure of U.S.

3  currency, ledger books, drug customer information lists, bank statements, packaging

4  materials, cellular phones, and other items related to the possession, sale, and distribution

5  of illegal narcotics and money laundering.  I have also attended formal and informal

6  narcotics related training through the Gwinnett County Police Department.

7        3.       In connection with my official DEA duties, I investigate criminal violations

8  of state and federal drug laws and related offenses, including, but not limited to,

9  violations of Title 21, United States Code, §§ 841, 843, 846, 848, 856, 952, 960, and 963,

10  and Title 18, United States Code, §§ 1956 and 1957.

11              <u>**INTRODUCTION AND PURPOSE OF AFFIDAVIT**</u>

12        4.       This affidavit is submitted for the limited purpose of establishing probable

13  cause to search the locations listed below, more particularly described in Attachment A

14  hereto (collectively, the "**Target Premises**"), for evidence of persons known and

15  unknown, who have committed, are committing, and will continue to commit federal

16  felony offenses, and evidence of the commission of those offenses, to wit, possession of

17  controlled substances with intent to distribute in violation of Title 21, United States Code,

18  Section 841(a)(1); attempt and conspiracy to commit an offense in violation of Title 21,

19  United States Code, Section 846; money laundering in violation of Title 18, United States

20  Code, Sections 1956; attempt and conspiracy to commit money laundering in violation of

21  Title 18, United States Code, Section 1956 and aiding and abetting the same in violation

22  of Title 18, United States Code, Section 2 ("Target Offenses"), all as described in

23  Attachment B: hereto:

24        a.   The person of Mario James EARL (hereafter, "EARL"), born in 1978.

25        b.   The person of Elisa JOHNSON (hereafter, "JOHNSON"), born in 1990.

26
27        c.   The person of Maurice LYNCH (hereafter, "M. LYNCH"), born in 1975.

d. The person of Turomne WASHINGTON (hereafter, "WASHINGTON"), born in 1989.

e. 11527 113th PL NE, Kirkland, Washington (hereafter, "Target Premise #1") is described as an approximately 0.1984 acre lot containing an approximately 1,380 sq ft, single-family home that is brown in color with the number 11527 clearly displayed over the garage door;

f. 5416 Rainier Ave S, Seattle, Washington 98118 (hereafter, "Target Premise #2") is described as a single office space on the top floor and the furthest right door of a multi-floor business building that sits on an approximately 0.1127 acre lot;

g. A white Cadillac Escalade, bearing Washington license plate CGG6626 (hereafter, the "White Escalade");

h. A 2021 white Tesla, WIN: 5YJSA1E64MF44189,  bearing Washington license plate CFC9473 (hereafter, the "White Tesla").

i. 2016 S. 104th Street, Burien , Washington (hereafter, "Target Premise #3") is described as the upstairs unit of a two-story multi-family building. The target unit has a blue front door with a poster that states "BLACK LIVES MATTER" affixed to the front door. The building has the unit number "2016" on the outside of the front of the unit.

j. 802 S. 31st St, Renton, Washington (hereafter, "Target Premise #4") is described as an approximately 7,800 sq ft lot containing an approximately 2400 sq ft, 4 bedroom, 2.75 bathroom, single-family home that is gray in color with the number "802" clear displayed to the left of the garage door.

k. 1838 E 34th Street, Tacoma, Washington (hereafter, "Target Premise #5") is described as an approximately 9,750 sq ft lot containing an approximately 1,238 sq ft, 3 bedroom, and 1 bathroom, single-family home that is white, with a white front door, and four windows on the front side of the house.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  I have not included every fact concerning this investigation.  Rather, I have set forth the facts that I believe are necessary for a fair determination of probable cause. Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that the

1    items described in Attachment B will be found at the locations described in Attachment

2    A, and constitute evidence, fruits, and instrumentalities of violations of Title 21 U.S.C.

3    Sections 841, 846, and 856, and Title 18 U.S.C. Section 1956.

4                              **SUMMARY OF PROBABLE CAUSE**

5          6.      Since December 2021, DEA Atlanta has been investigating a Drug

6    Trafficking and Money Laundering Organization lead by Mario EARL (hereafter referred

7    to as the EARL DTO or the DTO) which is responsible for distributing thousands of

8    kilograms of cocaine throughout the United States, on a yearly basis. Agents learned that

9    the DTO would receive kilogram quantities of cocaine shipments which they would store

10   at DTO stash houses.[1] The DTO would then sell kilogram quantities of cocaine to local

11   distributors, and collect the proceeds which would be stored at the DTO stash houses.

12   Stash house operators would record sales, proceeds received, and debts owed by buyers

13   in both electronic and paper ledgers.

14         7.      When EARL announced a money pick up, the stash house operators would

15   compile the proceeds which would later be transported by DTO members via automobile

16   to a different DTO stash location for a final count. Agents learned that the automobiles

17   were equipped with traps (aftermarket hidden compartments)[2] and were frequently

18   registered in the name of a DTO member, or one of their associates. In some instances,

19   female members of the DTO would rent automobiles for male DTO members to use in

20   furtherance of the DTO.

21         8.      The investigation by DEA Atlanta between December 2021 and December

22   of 2023, led to the identification of and search warrant executions at multiple DTO stash

23   houses. Evidence seized from those stash houses revealed planning and coordination

24   _____

25   [1] A stash house is a location used to store illegal drugs, drug proceeds, and tools and implements of drug trafficking
     and money laundering. In this organization, DTO stash houses were also typically owned by a DTO member or

26   associate, or rented in the name of a DTO member who did not live at the location.
     [2] Based on my knowledge, training, and experience, vehicles containing traps are used to evade law

27   enforcement detection while transporting large amounts of illegal narcotics, proceeds from the sale of
     illegal narcotics, and firearms used in furtherance of narcotics trafficking.

between DTO members, electronic and handwritten drug and money ledgers, and correspondence between members and associates of the DTO, revealing an extremely sophisticated organization operating throughout the United States.

### *July 7, 2022, Home Invasion, and Armed Robbery, in Bergen County, NJ*

9.      During this investigation, Agents learned that on July 7, 2022, a home invasion and armed robbery occurred at a DTO stash house used to store drugs and drug proceeds in Bergen County, New Jersey. The house was rented in the name of two DTO members: Dominique GWINN and Elisa JOHNSON.[3] A search of the residence revealed two large industrial size safes, one of which contained three, one-kilogram packages of a white powdery substance, which based on my knowledge, training, and experience I believe to be consistent with cocaine, a schedule II-controlled substance. The substance has been submitted for testing, but the results have not yet been received by DEA Atlanta. Also recovered from the residence was one handgun, multiple vacuum sealers, dozens of vacuum sealer bags, and numerous documents and affects bearing the names of and belonging to DTO members EARL, JOHNSON, GWINN, and Turomne WASHINGTON.

10.      A Starbucks cup bearing the name "Mario" on the printed label was found in one of the bedrooms of the stash house. The coffee was purchased from a nearby Starbucks via EARL's Starbucks Mobile app on the same day as the robbery. A review of surveillance footage from the Starbucks verified that EARL purchased the coffee earlier that morning. In the same bedroom, law enforcement located a bag with the embroidered initials "MJE," (Mario James Earl) which contained medication prescribed to EARL. Law enforcement also observed utility bills and other mail that indicated the DTO had other stash locations in the New Jersey area. Laptops, four cellphones, other electronic

---

[3] Neither GWINN nor JOHNSON was present during the robbery, nor were they living in the location at any point.

1  storage devices, and hand-written detailed drug and money ledgers were also located

2  inside of the residence.

3      11.    The ledgers documented transactions, addresses of parking garages where

4  the DTO leadership was comfortable conducting these transactions and or money pick-

5  ups, bills and even the current price of cocaine per kilogram in different parts of the

6  country, as seen in the photographs below.





12.     An analysis of the electronic devices seized at the residence, which are believed to belong to EARL, revealed extensive communications between DTO members, as well as drug and money ledgers which detailed inventory, and money collected by several of the organization's stash houses.

13.     One of the laptops located during the search is believed to belong to EARL. The laptop was located in close proximity to other electronic storage devices, and hand-written detailed drug and money ledgers. Law enforcement attempted to search the contents of the laptop, but were unable to due to a sophisticated password and encryption. Based on my training and experience, I believe EARL utilized that laptop to further communicate, document, and facilitate in the further distribution of cocaine and operations of the DTO.

14.     This belief was confirmed later in the investigation when agents located email communication between EARL and other members of the DTO. These email communications consisted of instructions to rent additional stash houses as well as emails discussions about the fraudulent documents that EARL would later email to members of the DTO as proof of employment to rent said stash houses.

15.     Based on a review of the ledgers, agents discerned that the DTO provided a regular customer with approximately 409 kilograms of cocaine from February 11, 2022, through May 7, 2022. At the start of the ledger, the customer already amassed a debt of $648,000. The ledger also indicates that between February 11, 2022, through May 7, 2022, the customer paid the DTO a total of $8,490,615 for cocaine that was issued on credit. As of the final ledger entry, the customer still owed an outstanding debt of approximately $782,385 to the DTO.

16.     During the execution of the same search warrant, a Nissan Sentra registered to GWINN (which contained a trap compartment) was recovered from the driveway of the residence. Inside the residence, investigators recovered oil change paperwork for a different Nissan Sentra, bearing the name of Jovan, an address of 17336 Park Ave,

1   Lansing, IL, 60438, and a contact number of 773-410-8857. AT&T records revealed 773-
2   410-8857 to have been registered to Jovan JACKSON Sr (a high-ranking member of the
3   DTO) since December 30, 2020.

4   ### *July 18, 2022, Search Warrant in Fairburn, GA*

5       17.    On July 18, 2022, law enforcement was surveilling a DTO stash house in
6   Fairburn, GA when Maurice LYNCH (brother of high ranking DTO member Ramondo
7   LYNCH) exited the stash house with several bags, and entered an Uber with his teenage
8   daughter. During a traffic stop, M. LYNCH fled from the vehicle on foot and was
9   arrested after discarding a bag containing two kilograms of cocaine. A search warrant
10  executed at the Fairburn Stash house led to the recovery of approximately 15 kilograms
11  of psychedelic mushroom bars, 5 pounds of THC edibles, 2 firearms, approximately 6
12  cell phones, handwritten detailed drug and money ledgers, and $112,000. Inside the
13  residence, Agents located documents (including money orders, bills, and receipts) which
14  linked EARL, R. LYNCH, M. LYNCH, and JOHNSON to the home, and led agents to
15  identify other DTO stash houses in the Atlanta, Georgia area, and around the country.[4]
16  Agents located flight luggage tags for Delta flights taken by EARL and JOHNSON, as
17  well as Amazon packages addressed to EARL, and prescription medication in his name.
18  Information gathered during the execution of this warrant, and the investigation of the
19  DTO to date, led to DEA Atlanta executing an additional state search warrant in
20  Baltimore, MD two days later.

21  ### *July 20, 2022, Search Warrant in Baltimore, MD*

22      18.    On July 20, 2022, DEA Atlanta, in conjunction with DEA Baltimore,
23  executed a state search warrant at a Baltimore stash house where DTO member R.
24  LYNCH was being surveilled. R. LYNCH fled prior to the execution of the search

25

26

27  [4] Agents also located numerous black dog kennels and cages in the garage of the home, some of which contained French bulldogs.

Affidavit of SA Leyva - 8
WAW USAO # 2022R01345

1   warrant. At the residence, agents located an additional Nissan Sentra[5] parked in the

2   garage of the home. The Sentra was equipped with a trap compartment in the floorboard

3   of the vehicle, which contained approximately $85,000 in vacuum-sealed packaging and

4   a stolen firearm. Agents also located approximately three cell phones, handwritten

5   detailed drug and money ledgers, and an additional $15,000 in U.S. Currency in the

6   residence.

7                    ***GPS Ping for Phones used by JOHNSON & GWINN***

8        19.    On August 16, 2022, Bergen County Prosecutors Office received search

9   warrants for the GPS Ping monitoring of cellular devices used by JOHNSON and

10  GWINN. Using those pings, agents were able to surveil GWINN and JOHNSON, and

11  were able to identify numerous stash houses where the DTO stored cocaine, other illegal

12  drugs, and drug proceeds. Through electronic and physical surveillance agents were also

13  able to observe how the DTO transported cocaine and/or drug proceeds from one stash

14  house to another, across state lines, between at least six different states. Eventually,

15  agents sought and were granted warrants to search additional DTO stash houses in the

16  states of Georgia, New York, New Jersey, and North Carolina.[6]

17           ***September 15, 2022 - Search Warrants executed at GWINN's Apartment and***

18                                   ***JACKSON's Residence***

19       20.    On September 15, 2022, DEA Atlanta executed warrants at an Atlanta,

20  Georgia apartment rented by GWINN and a house owned by high-ranking DTO member

21  Jovan JACKSON in, Snellville, GA. No evidence was recovered from GWINN's

22  apartment, which appeared vacant. However, agents noticed several empty duffle bags

23  inside the apartment, and seized a Nissan Sentra (registered to GWINN and affixed with

24

25

26  [5] DEA Atlanta has identified multiple different Nissan Sentras used by this DTO to traffic narcotics and proceeds, all of which contain traps. Two of the DTO Nissan Sentras were registered to Dominique Gwinn.

27  [6] Although the DEA identified an additional suspected stash location in Chicago, Illinois, a search warrant was not executed at that location.

her parking pass) from the apartment complex parking deck. The vehicle contained an empty trap compartment. Agents are aware that GWINN was actively living and paying rent at another location, while the rent was still being paid to maintain this apartment. For that reason, agents believe the apartment was used solely as a stash location.

21.     The search of JACKSON's house revealed a Nissan Sentra  parked in the garage with $710,000 hidden in a trap compartment inside the vehicle. Agents recovered six handguns from a kitchen cabinet, multiple vacuum sealers and dozens of vacuum sealer bags from the home, several duffle bags matching the same brand and dimensions found in GWINN's apartment, and numerous documents (including but not limited to internet bills, receipts, business documents, bank account statements, and documents related to additional vehicles,) bearing Jovan and Marlene JACKSON's names, indicating they were the primary residents and owners. Agents also recovered documentary evidence of other residences utilized by the DTO, an Apple laptop, approximately six cellphones, handwritten detailed drug and money ledgers, and an additional approximately $50,000 inside of the residence.

22.     An analysis of the electronic devices seized at the residence reveled extensive stored communications and ledgers, including detailed financial notations for several of the organization's stash houses. Based on the analysis of the ledgers and communications, agents believe that the DTO distributed approximately 1,140 Kilograms of cocaine (Units) and received approximately $15,591,599.00 in proceeds between May 1, 2022, and July 30, 2022.

### *September 15, 2022 - Search and Seizure Warrants executed in Bergen County, NJ*

23.     On September 15, 2022, in conjunction with DEA Atlanta, Bergen County Prosecutors Office executed state search and seizure warrants at multiple (approximately three) DTO stash locations in Bergen County New Jersey. During the execution of these warrants, approximately 1.6 million in United States currency was seized. The largest concentration of bulk US currency came from inside of a trap located inside a Jeep

Cherokee, parked outside of a DTO stash house. The 2nd largest concentration of bulk US currency came from a trap inside of a Nissan Rogue which was parked outside of a DTO stash house.[7] Law enforcement also recovered several money counters, handwritten detailed drug and money ledgers, vacuum sealers, and other paraphernalia consistent with packaging bulk amounts of drug proceeds.

24.    Turomne WASHINGTON was arrested inside of a DTO stash location at 2030 Hudson Street, Apartment 1236, in Bergen County New Jersey. Agents found his identification, bank cards, and personal items throughout the apartment. Additionally, during the execution of these warrants, law enforcement recovered a Glock handgun located inside of a trap in a Nissan Murano which was known to be operated by WASHINGTON.

25.    During the search of a DTO stash house in Englewood, New Jersey, law enforcement recovered a loaded assault rifle in a hidden room built within the residence.[8] Law enforcement also recovered several vehicle key fobs which were definitively linked back to the trap vehicles referenced in paragraph 20 above, as well as a "trap" vehicle previously recovered from the residence located at the DTO stash location referenced in paragraph 8 above.

26.    During the search warrant executions on September 15, 2022, law enforcement also recovered four cellular devices believed to be utilized by WASHINGTON. These devices were submitted to the BCPO Digital Forensics Lab for processing. WASHINGTON was arrested and charged with one count of N.J.S.A. 2C:

---

[7] The car keys to the Jeep Cherokee and the Nissan Rogue, were recovered from inside one of the DTO stash locations in Bergen County, New Jersey.

[8] EARL has a 2009 conviction for Conspiracy to Distribute Marijuana in the Western District of Washington in case number 2009-CR-00006. In that case, EARL ran a sophisticated interstate marijuana trafficking ring along with his brother and several codefendants. A search warrant executed at EARL's home in West Seattle on January 13, 2009, revealed distribution quantities of marijuana, a magazine for an assault rifle, ammunition, fraudulent identification documents, and a secret room in the home, specially constructed to evade casual detection which was used to store marijuana.

1    21-25(a), Financial Facilitation of Criminal Activity ("Money Laundering"), and N.J.S.A.

2    2C: 36-3, Possession with Intent to Distribute Drug Paraphernalia.

3                    ***September 15, 2022 - Search Warrant executed in Charlotte, NC***

4         27.    On September 15, 2022, DEA Charlotte, NC executed a federal search

5    warrant at a DTO stash location in Charlotte, NC. Agents seized approximately $175,000

6    in cash and eight kilograms of a substance which field tested positive for cocaine and

7    fentanyl (both schedule-II controlled substances), from a large industrial safe located in

8    the home. Agents confirmed that the safe was purchased through Spartan Safe Company

9    by DTO member Jovan JACKSON on June 24, 2022. Also recovered from the residence

10   were multiple vacuum sealers, dozens of vacuum sealer bags and hand-written detailed

11   drug and money ledgers. Agents also seized documents bearing Jovan JACKSON's and

12   Turomne WASHINGTON's names.

13              ***March 2, 2023 – Search warrant executed at Ramondo LYNCH's residence in***

14                                        ***Sandy Springs, GA***

15        28.    On March 2, 2023, DEA Atlanta executed a federal search warrant at 6470

16   Wright Circle, Sandy Springs, GA, a home owned by DTO member Ramondo Lynch.

17   Agents were aware that no one had been inside the home since shortly after the warrant

18   execution on the Fairburn Stash house in July of 2022. Inside the residence, agents seized

19   numerous handwritten drug and money ledgers, bank and utility documents listing the

20   name Ramondo LYNCH, luxury custom jewelry receipts, a vacuum sealer, and

21   approximately nine cell phones. Analysis of the electronic devices seized at the residence

22   reveled extensive stored communications between DTO members and associates

23   coordinating cocaine deals, money drop offs and pickups, and detailed ledgers, which

24   included detailed notations for several of the organization's stash houses. Agents also

25   located phone bills, business fillings, vehicle information, and money orders tying other

26   DTO members to the location.

27

1    ### *Financial Investigation*

2    29.    During the investigation, agents reviewed bank statements from an account

3    owned by EARL. Based on my knowledge, training, and experience, financial institutions

4    (banks) have transaction reporting requirements which flag cash deposits of $10,000 or

5    more. These reporting requirements are intended to assist law enforcement in the

6    identification of drug proceeds and money laundering activity. I am also aware that drug

7    traffickers who make large cash deposits into their bank accounts, split the deposits up

8    into multiple deposits under that $10,000 amount to avoid the financial transaction

9    reporting requirements of banks and other financial institutions.

10    30.    In February of 2022, a series of cash deposits were made into EARL's

11    Wells Fargo account via in branch deposits and ATM cash deposits. Three separate

12    deposits of $3,000 (for a total of $9,000) was deposited via ATM on February 5, 2022.

13    Three additional cash deposits of $2,900 (for a total of $8,700) and a single deposit for

14    $800 were made via ATM on February 2, 2023. On February 8, 2022, three separate

15    deposits were made into EARL's account at a Wells Fargo Branch. The first deposit was

16    for $9,000 the second was for $9,800, and the third was for $250. Based on my

17    knowledge, training, and experience, I believe these cash deposits were split into multiple

18    transactions in an amount under $10,000 to avoid the transaction reporting requirements

19    of financial institutions, and to evade law enforcement detection.

20    ### *October 24, 2023- Federal indictment for members of the DTO*

21    31.    On October 24, 2023, a Federal Grand Jury in the Northern District of

22    Georgia returned an indictment charging several individuals, including EARL, R.

23    LYNCH, JACKSON, M. LYNCH, WASHINGTON, JOHNSON, and GWINN with

24    conspiracy to distribute a controlled substance (cocaine) in violation of Title 21, United

25    States Code, Sections 846 and 841 (Count One), and conspiracy to launder money (Count

26    Seven), among other charges, in Case No. 1:23-CR-335 (under seal). Following the

27

1  indictment, the Court issued arrest warrants for each of these individuals. None of the

2  charged defendants have been arrested yet.

3  *__Identification of 11527 113th PL NE, Kirkland, WA "Target Premise #1"__*

4      32.    During the investigation agents learned that on or about October 26, 2012,

5  JOHNSON purchased 11527 113th PL NE, Kirkland, WA (**Target Premise #1**). On or

6  about July 21, 2016, **Target Premise #1** was sold by JOHNSON to EARL. A search of

7  law enforcement data bases indicate that EARL is still the owner of **Target Premise #1**,

8  and per the Washington State Department of Licensing (DOL) the address on EARL's

9  driver's license is **Target Premise #1**.

10      33.    EARL has used and continues to use a Verizon cellular device assigned call

11  number (206) 806-1314, subscribed in the name of Mario J Earl, since October 9, 2019.

12  The Bergen County (NJ) Prosecutors Office (BCPO) received court authorized

13  geolocation data for (206) 806-1314, in approximately September and October of 2022.

14  During that time, the geolocation data indicated that (206) 806-1314 was in Seattle,

15  Washington. DEA Seattle conducted physical surveillance of EARL which consistently

16  put EARL in the same location as the geolocation data from (206) 806-1314. Based on

17  that information, and the continued surveillance, agents determined that EARL was in

18  possession of (206) 806-1314.

19      34.    Agents identified that JOHNSON has used and continues to use a Verizon

20  cellular device assigned call number (206) 507-1108, subscribed in the name of Elisa I

21  Johnson. The subscriber information lists **Target Premise #1** as the contact address

22  associated with the account since October 19, 2018.

23      35.    On January 13, 2023, DEA Atlanta obtained a geolocation warrant for

24  (206) 507-1108, during which time DEA Atlanta and DEA Seattle conducted physical

25  and electronic surveillance of JOHNSON . Based on the physical surveillance which

26  consistently put JOHNSON in the same location as geolocation data from (206) 507-

27  1108, agents determined that she was in possession of (206) 507-1108.

36.     Agents learned EARL has an active Airbnb account where **Target Premise #1** has been advertised for rent. The webpage[9] for **Target Premise #1** indicates **Target Premise #1** has been listed for rent for approximately 1 year, with the last review provided by a renter in August of 2023. This time frame is consistent with when EARL and JOHNSON moved out of their previous apartment and moved into **Target Premise #1** full time. Even though the Airbnb webpage for **Target Premise #1** is still active, the available dates to rent **Target Premise #1** are blacked out until June 15, 2024.

37.     On December 14, 2023, DEA Atlanta obtained a geolocation search warrant for the cellular devises that are known to be used by EARL and JOHNSON.

38.     A review of overnight activity for both historical location data and live geolocation data placed almost every night both cellular facilities consistently connecting to the cell sites in the area of **Target Premise #1**.  A review of the geolocation data also revealed that both EARL and JOHNSON often leave **Target Premise #1** together and travel to the gym around 5:45 a.m. The geolocation data shows them both stay for a reasonable amount of time then travel back to **Target Premise #1.** This is behavior is consistent with EARL and JOHNSON going back to **Target Premise #1** to shower and change after attending the gym, further indicating that **Target Premise #1** is their primary residence.

39.     On December 20, 2023, during surveillance DEA Seattle agents observed JOHNSON answer the front door of **Target Premise #1** accompanied by a small dog.

40.     Based on the investigation to date, along with my training and experience, I believe EARL and JOHNSON have moved into **Target Premise #1** as their primary residence and that EARL and JOHNSON will be present inside of **Target Premise #1,** when agents execute the Search warrants.

---

[9] https://www.airbnb.com/rooms/713678641359624791?adults=4&pets=1&check_in=2023-01-05&check_out=2023-01-09&source_impression_id=p3_1672518902_DcA8n6PTUSNZOviZ

### _Identification of 5416 Rainier Ave S, Seattle, WA 98118 "Target Premise #2"_

41.    During the investigation, agents learned that EARL directed JOHNSON and GWINN to rent houses and apartments around the country to be used by the DTO as stash houses. A review of several of the lease agreements for those stash houses reveled that JOHNSON and GWINN used fraudulent pay stubs provided by EARL to show proof of income. On several of the lease agreements, JOHNSON listed MCM Realty Investments LLC, 5416 Rainier Ave S, Seattle, WA 98118 (**Target Premise #2**), (a company owned by EARL) as her employer, and "James EARL" as her supervisor. The fraudulent paystubs were made to create the appearance that JOHNSON worked at and earned a salary from MCM Realty Investments, LLC located at **Target Premise #2.** Electronically stored communications between EARL, JOHNSON, and GWINN, confirmed that the paystubs were fraudulent, and were created solely to lease the locations.

42.    An open-source search of MCM Realty Investments LLC identified EARL as the owner and president of the company. EARL, through MCM Realty Investments LLC, owns a building in Seattle containing **Target Premise #2**. The building has three street addresses: 5418 Rainier Ave S, Seattle, WA (bottom floor); 5416 Rainier Ave S, Seattle, WA (top floor)( **Target Premise #2)**; and 4419 S Brandon street, Seattle, WA (rear of building). The building that contains **Target Premise #2**, has at least nine exterior doors: four on the south side, one on the west side, three on the north side, and at least one on the east side.

43.    The company website, https://mcmrealtyinvestments.com/, identifies EARL as the president and advertises retail and apartment space for rent at 4419 South Brandon Street, Seattle, Washington 98118. on the website agents identified a link for the Airbnb webpage that was previously mentioned for **Target Premise #1.**

44.    A review of the geolocation data for both EARL and JOHNSON shows them leaving **Target Premise #1** and then traveling to **Target Premise #2,** where they

would remain throughout the work hours of the day. The data then shows them both leaving **Target Premise #2** and traveling back to **Target Premise #1.** This pattern is almost on a daily basis as it pertains to EARL, but is less consistent as it pertains to JOHNSON. Based on my training and experience I believe that **Target Premise #2** is the location of EARL and JOHNSON's offices and this is confirmed based on observations made by DEA Seattle members.

45.     Agents have reviewed video surveillance footage of the building from mid-December to early January, 2024 via a pole camera. From this review, agents believe there are many doors on the building that only access one unit, and do not connect internally with other units. There are also at least two doors that access a basement space which includes additional internal entrances to other units.

46.     Agents have observed EARL access many points of the building, but primarily one door on the south side: the top floor, easternmost door (**Target Premise #2**).  Agents believe this door accesses EARL and JOHNSON's office. EARL is often there alone, and others don't go in that door without him. Agents have seen other people enter **Target Premise #2**, but not without EARL or when EARL is already inside (the exception being JOHNSON).

47.     During the observations, EARL usually parks his Cadillac Escalade in front of the building along Rainier Ave S or on a side street next to the building. EARL usually carries a briefcase or bag with him when entering **Target Premise #2**. On an almost daily basis, agents observe EARL arrive in the morning and enter **Target Premise #2** and stay most of the day. EARL appears to unlock the door to **Target Premise #2** when he arrives, suggesting it was not open to the public or to others without him. JOHNSON was also seen using a key to access **Target Premise #2** on her own. It appears EARL is keeping regular business hours at this location, in the south side, second floor, easternmost door (**Target Premise #2**).

48. A photo of the south side of **Target Premise #2** the building, with EARL's office door highlighted in yellow is depicted below:



49. Agents have also observed EARL regularly going into a door on the north side of the building, which is accessed off Brandon Street. From photos on the MCM Realty Investments website, it appears this door opens to a stairwell which accesses multiple basement level units. Agents have noticed many other people use this door, with or without EARL. Since EARL owns the building, he may be going in and out of this door for regular maintenance and there are portions of the building under construction. EARL has been seen coming and going from this door with tools and other construction equipment. Based on the presence of hidden rooms in other stash locations used by EARL in his prior case and in a DTO safe house in this case, there may be hidden rooms containing evidence of the DTO's operation on the premises.

50. During the surveillance of EARL, he has and continues to be observed driving a white Cadillac Escalade, bearing Washington license plate CFC6626 hereafter, the "**White Escalade.**" The **White Escalade** is registered to MCM Realty Investments, LLC and Mario EARL at 5418 Rainier Ave S, Seattle, WA.

51. During these observations, JOHNSON has and continues to be observed driving a white Tesla, bearing Washington license plate CGG6626 (hereafter, the "**White Tesla**"), registered to Elisa JOHNSON at 11410 NE 124 street #243, Kirkland, WA. This address is for a UPS store P.O. box #243.

52.     Based on my training and experience, and observations made by DEA Seattle, I believe that EARL and JOHNSON are using **Target Premises #2** as their office. Additionally, I believe that EARL is transporting potential evidence inside of his briefcase/bag from **Target Premises #1** to inside of **Target Premises #2.** It is common for people to us a briefcase/bag to store and or transport computers, tablets, documents, and other storage devices from one location to another.

### ***Identification of 2016 S 104th Street, Burien, Washington "Target Premise #3"***

53.     During the investigation agents identified a JPMorgan Chase Bank account utilized by WASHINGTON, and subpoenaed bank information and records for the account. In those records WASHINGTON provided 2016 S104th Street, Burien, Washington (**Target Premises #3**) as his personal address when opening the account on July 5, 2022.

54.     On September 15, 2022, WASHINGTON was arrested  during the execution of a search warrant in Bergen County, New Jersey, at a known stash location utilized by the DTO. During his arrest, WASHINGTON's cellular telephone was seized as evidence. That telephone is still in the possession of law enforcement. WASHINGTON was released on bond from the Bergen County Jail on September 26, 2022, and activated a T-Mobile cellular device assigned call number (201) 233-9590 on September 27, 2022.

55.     WASHINGTON has and continued to use (201) 233-9590.  Shortly after the activation of (201) 233-9590, WASHINGTON provided (201) 233-9590 to the Washington State Department of Corrections as his contact number as a requirement of his status as a registered sex offender. (201) 233-9590 was also provided as a number where WASHINGTON's parole officer could reach him. On February 10, 2023, at his annual check in with parole, WASHINGTON verified (201) 233-9590 as his current number and 2016 S104th Street, Burien, Washington (**Target Premises #3**) as his current billing address.

56.     On December 19, 2023, DEA Atlanta obtained a geolocation search warrant for (201) 233-9590, the cellular device known to be used by WASHINGTON.

57.     A review of overnight and daytime activity for both historical location data and live geolocation data shows WASHINGTON's cellular facilities consistently connecting to the cell sites in the area of **Target Premises #3**. DEA agents also observed via a static surveillance platform (pole camera) WASHINGTON at **Target Premises #3, a**s recently as January 10, 2024.

58.     The review of the geolocation data also shows that WASHINGTON sleeps at **Target Premises #3** and remains there throughout the night hours on several occasions.  Based on the surveillance, the geolocation data, and my training and experience, I believe that **Target Premises #3** is WASHINGTON's primary address.

59.     Occasionally, WASHINGTON will spend the night at 802 S 31st St, Renton, Washington **(Target Premises #4),** a residence believed to be his girlfriend's residence**.** and that he occasionally spends some nights at his girlfriend's residence; **Target Premises #4**.

### *Identification of 802 S 31st St, Renton, Washington "Target Premise #4"*

60.     Upon reviewing both historical location data and live geolocation data for WASHINGTON's cellular facilities agents identified WASHINGTON consistently connecting to the cell sites in the area of **Target Premise #4.** WASHINGTON has and continues to spend a considerable amount of time at **Target Premise #4** and would occasionally sleep at **Target Premise #4** and remain at **Target Premise #4** throughout the night and early morning hours.

61.     A search of law enforcement data bases as well as an open source search identified that **Target Premise #4** is associated with Dominique Lee. Agents identified a phone number associated with Lee and that phone number is in contact with WASHINGTON and is one of his top callers. A search of social media accounts associated with Lee, led agents to identify a Facebook account believed to belong to Lee.

A review of the Facebook account, agents located two photographs that were posted, one dated June 5, 2023, and the other on April 6, 2022, both of which depict WASHINGTON and a small child together.  Based on the photographs and review of the Facebook account agents believe that WASHINGTON is the father of the small child and Lee is the mother. Agents believe that WASHINGTON is splitting time between **Target Premise #3** and **Target Premise #4** due to WASHINGTON's child living at **Target Premise #4.**

62.     On January 9, 2024, agents observed WASHINGTON exit **Target Premise #4** and get into a Buick Enclave bearing WA tag A6873816, that was parked in the driveway of **Target Premise #4.** The Buick Enclave bearing WA tag A6873816 is registered to Dominque LEE. WASHINGTON was then observed pulling out of the driveway and departing **Target Premise #4.** Agents were able to confirm that the live geolocation data from WASHINGTON's cellular devices was traveling in tandem with WASHINGTON as he left **Target Premise #4.** Agents monitored the data which showed WASHINGTON travel to an industrial complex with several business.  Agents were able to follow the geolocation data and locate the Enclave in the parking lot but the vehicle was unoccupied. Agents maintained surveillance on the Enclave and eventually observed WASHINGTON get back into the Enclave. Agents maintained constant surveillance on the Enclave as it left the parking lot and drove directly to **Target Premise #3.** Again, the geolocation data for WASHINGTON's phone traveled in tandem with WASHINGTON driving to **Target Premise #3.** Agents observed via a pole camera at **Target Premise #3,** WASHINGTON walk up the steps and enter into **Target Premise #3.**

63.     Based on a review of the historical location data and live geolocation data for WASHINGTON's phone, the phone does not remain constantly on.  It appears the phone is turned off then turned on periodically. Based on my training and experience this behavior is consistent with a person who has multiple phones as well as a person that is trying to avoid being tracked by law enforcement. Often a person who is trying to avoid

detection from law enforcement, would turn their phone off so law enforcement cannot track them via their cell phone.

### *Identification of 1838 E 34th Street, Tacoma, WA "Target Premise #5"*

64.     During the investigation, agents identified a T-Mobile cellular device assigned call number (404) 604-1138, subscribed in the name of RUSSELL BANETT at 1838 E 34TH ST TACOMA WA 98404-4803 (**Target Premise #5),** which is believed to be used by DTO member Maurice LYNCH.

65.     After his arrest on July 18, 2022, M. LYNCH's cellular telephone was seized as evidence. That telephone was subscribed in the name "RUSSELL BANETT," and is still in the possession of law enforcement. M. LYNCH was released on bond from the Fulton County (GA) Jail on July 20, 2022. On July 23, 2022, the cellular device assigned call number (404) 604-1138 was activated, and subscribed under the name "RUSSELL BANETT" at 1838 E 34TH ST TACOMA WA 98404-4803 (**Target Premise #5**).

66.     On December 29, 2023, DEA agents observed via a static surveillance platform (pole camera) Ramondo LYNCH at **Target Premise #5**.  Based on geolocation data from R. LYNCH's cellular device, it revealed that R. LYNCH stayed at **Target Premise #5** overnight for several days.  DEA Seattle agents also observed M. LYNCH at **Target Premise #5**.

67.     On January 3, 2024, DEA Atlanta obtained a geolocation search warrant for the cellular device that is known to be used by M. LYNCH. A review of overnight activity for both historical location data and live geolocation data showed M. LYNCH's phone connecting to the cell sites near **Target Premise #5** almost every night and into the early morning hours.

68.     During the investigation agents identified an Instagram Account with the name @executiveprints, which is associated with and belongs to Ramondo LYNCH (brother of M. LYNCH). On or about February 16, 2023, DEA located several

photographs and videos posted on Instagram by R. LYNCH via @executiveprints, which depict R. LYNCH walking in the back yard of a residence. In the video you can see the back of the residence and the surrounding area. The video is also tagged with the location as Seattle, WA. Additional videos and photographs depicted several French bulldogs on the property and large unique black cages that contained more dogs.

69.    By comparing the photographs and videos posted by R. LYNCH, to the back yard of **Target Premise #5** agents were able to determine that the photographs and videos were taken in the back yard of **Target Premise #5.** The large black dog cages and the dogs themselves in the photographs and videos appear to be the same type seen during the search warrant execution at the DTO stash house on July 18, 2022, in Fairburn, Georgia.

70.    Based on reviewing the pattern of life via the geolocation data received as of January 9, 2024, agents believe that M. LYNCH will be present inside of **Target Premise #5,** when agents anticipate executing the Search warrants.

71.    In virtually every DTO stash house where agents have executed search warrants, documents and cell phones have been seized, almost all of which contained evidence of the DTO's operations. Based on my training, experience, and knowledge of the investigation to date, I believe that there is evidence of the DTO's cocaine trafficking operations, and communications and coordination between the members in furtherance of the DTO contained within the **Target Premises.** I believe a search of the **Target Premises** will yield documentary evidence of the drug trafficking activities of this DTO, including but not limited to: drug and money ledgers, bank account information, telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, passports, accounts and records in fictitious names, false identification, money orders, cashier's checks relating to cash transactions, and records indicating the existence of storage facilities and other locations utilized by the DTO known or yet unknown. I believe searching the **Target Premises**

1   will lead to the identification and location of additional electronic devices that are used

2   by the Target Subjects. Electronic devices used by DTO members will contain valuable

3   evidence associated with the DTO's cocaine trafficking operations. Additionally, I

4   believe a search of the **Target Premises** will reveal aftermarket hidden compartments in

5   vehicles and secret rooms contained within the **Target Premises** that may contain

6   additional evidence of the DTO's cocaine trafficking conspiracy.

7       72.     Searching the **Target Premises** for those items as would most likely yield

8   evidence to prosecute the case in chief under this current indictment.

9                    **<u>KNOWLEDGE BASED ON TRAINING AND EXPERIENCE</u>**

10      73.     During my employment with DEA, I have been active in investigations

11  involving narcotics trafficking and distribution and money laundering.  I have received

12  training on the subject of narcotics trafficking and have been personally involved in

13  investigations concerning the possession, manufacture, distribution, and importation of

14  controlled substances, as well as methods used to finance drug transactions and launder

15  drug proceeds.  Further, I have and consulted with more senior agents that also have

16  participated in many wiretap investigations that resulted in a number of arrests and

17  seizures concerning drug trafficking and money laundering.  During the course of these

18  investigations, it was apparent that drug traffickers were using telephones in furtherance

19  of their illegal activities.  In addition, I have also analyzed telephone toll records and

20  other records and debriefed informants regarding the use of telephones.'

21      74.     Based on my training and experience, and based upon interviews I have

22  conducted with defendants, witnesses, and informants, as well as others with knowledge

23  of the importation, distribution, and transportation of controlled substances and of the

24  laundering and concealing of proceeds derived from drug trafficking, I am familiar with

25  the ways in which drug traffickers conduct their business.  For example, this includes, but

26  is not limited to, the methods of importing, packaging, transferring and distributing

27  narcotics, the use of electronic means and cellular telephones for calls and electronic

communications including, but not limited to, email and text messaging, the use of numerical codes, code words and other methods of avoiding detection by law enforcement.

75.     I am also familiar with the types and amounts of profits made by narcotics dealers and the methods, language and terms that are used to disguise the source and nature of the profits from their illegal narcotics dealing.  Additionally, I have learned about the ways that drug traffickers conceal, convert, transmit, and transport their drug proceeds, including but not limited to, the use of runners/couriers to transport currency and proceeds, the use of third parties to purchase or hold title to assets, and the use of off shore accounts.  Finally, I have written and/or executed search, seizure, and arrest warrants pertaining to the seizure of all types of criminal evidence, including illegal drugs, drug paraphernalia, drug proceeds, drug records, and evidence of other types of crimes.

76.     Based on my training, experience, and discussions with senior agents, I know that drug trafficking is often furthered by utilizing multiple cellular phones, multiple insulated contacts, pre-paid cellular phones, and phones designated to be used only for certain purposes or individuals, which is also known as compartmentalization.  I also know that narcotics traffickers often attempt to thwart law enforcement efforts by frequently changing and fictitiously registering vehicles, telephones, and utility services in order to conceal their true identity. I also know it is common for narcotics traffickers to conduct counter surveillance as well as perform "heat checks" to avoid law enforcement and aid in identifying if law enforcement is following the drug traffickers. All of these steps are designed to avoid detection by law enforcement and possible prosecution.

77.     Based on my training, experience, discussions with other agents and other law enforcement officers, I am aware that individuals who participate in crimes often use cell phones and online tools to facilitate and plan their criminal activity to include avoiding detection by law enforcement.  Specifically, I am aware that individuals

commonly use cell phones before, during, and after the commission of crimes to coordinate the crimes.

78.     I know, based upon my training, experience, and discussions with senior agents that narcotics trafficking and money laundering organizations routinely utilize a number of other operational techniques designed to achieve two goals: first, the successful facilitation of the organization's illegal activities, including the transportation and distribution of controlled substances and the subsequent collection of the proceeds of that illegal activity; and second, minimizing the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

79.     I have participated in this investigation and I am thoroughly familiar with the information contained herein either through personal investigation or through discussions with agents from other law enforcement agencies who have interviewed the individuals or who have personally obtained information that they have reported to me. Based on training, experience, and participation in narcotic and drug-related investigations, I know that:

a.     Individuals who deal in illegal controlled substances commonly maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the importation, manufacture, transportation, ordering, sale, and distribution of illegal controlled substances.  These items are typically maintained where the dealers in illegal controlled substances have ready access to them, such as in secured locations within their residence, the residences of friends, family members, significant others, and associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house.  Moreover, it is common that traffickers maintain such records on computers, cellular

telephones, personal tablets, laptop computers, and other personal electronic devices.

b.      Individuals who deal in illegal controlled substances routinely conceal in their residences or the residences of friends, family members, significant others, and associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house, large quantities of currency, financial instruments, precious metals, jewelry, and other items of value that are typically the proceeds of illegal controlled substance transactions.

c.      It is common for individuals who deal in the sale and distribution of illegal controlled substance, money laundering, and other criminal activity to utilize alternative currency such as cryptocurrency or digital currency, in an attempt to avoid detection from law enforcement. It is also common for these individuals to utilize storage devices commonly referred to cold storage devices to store large amounts of digital currency. It is also known that these individuals often maintain a key that is used to secure and control access to digital assets, such as cryptocurrency and other blockchain- based assets. It is also known that these individuals often maintain a seed phrases, a sequence of random words that stores the data required to access or recover cryptocurrency on blockchains or crypto wallets.

d.      It is common for individuals who deal in the sale and distribution of illegal controlled substances to secret contraband related to the activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, microwave ovens, pots, dishes, and other containers, at their residences, or the residences of friends, family members, significant

others, or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

e.      Individuals who deal in the sale and distribution of controlled substances commonly maintain addresses and telephone number books or papers, which reflect names, addresses or telephone numbers for their associates in their illegal organization.  These individuals often utilize cellular telephones, pagers, and telephone systems to maintain contact with their associates in their illegal businesses.  These telephone records, bills, and pager numbers are often found in their place of residence, or the residence of friends, family members, significant others, or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

f.      Individuals who deal in illegal controlled substances often take photos of themselves, their associates, their property, and illegal contraband.  These photos are usually maintained in their place of residence, or the residences of friends, family members, significant others, or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

g.      Persons who traffic controlled substances commonly maintain documents, letters, and records relating to illegal activity for long periods of time.  This documentary evidence is usually secreted in their residence, or the residences of friends, family, significant others, members or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house.  This documentary evidence includes, but is not limited to, telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, passports, accounts and records in fictitious names, false

identification, money orders, cashier's checks relating to cash transactions, and records indicating the existence of storage facilities used in narcotics trafficking. Indicia of occupancy, residency or ownership of the premises to be searched are often present in such premises.

h.      Individuals involved in drug trafficking often own, possess or use weapons, including firearms, as a means to facilitate their illegal drug activities. Such weapons are most often secreted in their residence, or the residences of friends, family members, significant others, or associates, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

i.      Individuals involved in drug trafficking commonly keep in their residences, businesses, and vehicles cellular telephones, telephone paging devices, and computers that they utilize to assist them in the conduct of their illegal business. The memory and contents contained on these items may contain evidence of drug trafficking activity. Many drug traffickers use more than one cellular telephone at the same time to conduct their drug trafficking activity and attempt to "compartmentalize" their communications—limit the use of particular cellular telephones with a particular individual or individuals—in order to minimize the risk of the interception of their communications by law enforcement.

j.      Individuals involved in drug trafficking often change their cellular telephone numbers and the physical phone handsets that they use to communicate when conducting their drug trafficking activities to minimize the risk of successful electronic interception and surveillance of their communications by law enforcement. In my experience, drug traffickers sometime keep the old physical phones with the intention of later changing the cellular telephone number associated with the physical phone in order

to use the phone again in the future to communicate with their drug trafficking associates. These phones and electronic storage memory for the phones—SIM cards, SD cards, and micro-SD cards—are frequently stored inside the drug traffickers' residences or businesses.

k.      In addition to routinely communicating by various and changing cellular phones and telephone numbers through voice calls, drug traffickers commonly communicate about their drug trafficking activities through Short Messaging Service ("SMS") or Multimedia Messaging Service ("MMS") text messages, and also at times through instant messaging. These messages can remain on the physical phone for indefinite periods of time and often can be recovered through forensic search of the physical phone, even when the messages have been deleted by the user. Some of these messages include photographs or documents.

l.      Individuals involved in drug trafficking are increasingly purchasing and using more sophisticated phones, such as Apple iPhones or Google Android system phones, that can connect to the internet over a wireless network and send and receive messages and attachments through internet-based email accounts and social networking accounts like Facebook and others. In my experience, drug traffickers are increasingly communicating with each other regarding their drug trafficking activities over the internet, including through the use of these internet-based email and private messaging media. "Smartphones" and computers are frequently kept inside the drug trafficker's residences, businesses, and vehicles.

## SEARCH OF DIGITAL DEVICES

80.      The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to

search and seizure pursuant to this warrant.  I seek this authority based on the following:

a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face, iris, or retina. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  While not as prolific on digital devices as fingerprint and facial-recognition features, both iris and retina scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light. Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels. A user can register one or both eyes to be used to unlock a device with these features. To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye.

e.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device, and may not be the only individual whose physical characteristics are among those that will unlock the device via biometric features.  Furthermore, while physical proximity is an important factor in determining who is the user of a device, it is only one among many other factors that may exist.

i.  Due to the foregoing, I request that if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, and if law enforcement reasonably suspects Mario James EARL, Elisa JOHNSON, Maurice LYNCH, and/or Turomne WASHINGTON is a user of the device, then – for the purpose of attempting to unlock the device in

1   order to search the contents as authorized by this warrant – law

2   enforcement personnel shall be authorized to:(1) press or swipe the fingers

3   (including thumbs) of Mario James EARL, Elisa JOHNSON, Maurice

4   LYNCH, and/or Turomne WASHINGTON to the fingerprint scanner of the

5   device; and/or (2) hold the device in front of the face and open eyes of

6   those same individuals and activate the facial, iris, or retina recognition

7   feature.

8   j.   In pressing or swiping an individual's thumb or finger onto a device and in

9   holding a device in front of an individual's face and open eyes, law

10  enforcement may not use excessive force, as defined in *Graham v. Connor*,

11  490 U.S. 386 (1989); specifically, law enforcement may use no more than

12  objectively reasonable force in light of the facts and circumstances

13  confronting them.

14  81.   As outlined above, in addition to cellular telephones, there is probable

15  cause to believe that members of the conspiracy use computers (desktop or laptops) to

16  facilitate their criminal activity.  Members of the conspiracy are believed to email among

17  themselves instructions and information about the conspiracy and to coordinate their

18  activities via that means of communication.  There is also probable cause to believe that

19  members of the conspiracy use computers to launder their illegal proceeds, for example

20  by using the computer to facilitate investments in real property or other assets.

21  82.   I know, based on my training, experience, and knowledge of this

22  investigation that much of the evidence of these crimes can be stored as data on digital

23  devices like computers and cellular telephones.  Thus, the warrant applied for would

24  authorize the seizure of digital devices or other electronic storage media or, potentially,

25  the copying of electronically stored information from digital devices or other electronic

26  storage media, all under Rule 41(e)(2)(B).

27

83.     Based upon my review of the evidence gathered in this investigation, my review of data and records, information received from other agents and computer forensics examiners, and my training and experience, I submit that if a digital device or other electronic storage media is found at the **TARGET PREMISES**, there is probable cause to believe that evidence of the crimes of discussed above will be stored on those digital devices or other electronic storage media, and that those digital devices are instrumentalities of said crime.

84.     There is, therefore, probable cause to believe that evidence of the crimes of described above and in Attachment B exists and will be found on digital device or other electronic storage media at the **TARGET PREMISES**, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be preserved (and consequently also then recovered) for months or even years after they have been downloaded onto a storage medium, deleted, or accessed or viewed via the Internet. Electronic files downloaded to a digital device or other electronic storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital device or other electronic storage media, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the digital device or other electronic storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

1
2

      d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

3      85.   *Forensic evidence.*  As further described in Attachment B, this application

4 seeks permission to locate not only computer files that might serve as direct evidence of

5 the crimes described on the warrant, but also for forensic electronic evidence that

6 establishes how digital devices or other electronic storage media were used, the purpose

7 of their use, who used them, and when. There is probable cause to believe that this

8 forensic electronic evidence will be on any digital devices or other electronic storage

9 media located at the **TARGET PREMISES** because:

10       a.  Stored data can provide evidence of a file that was once on the digital device or other electronic storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the digital device or other electronic storage media that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the history of connections to other computers, the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the digital device or other electronic storage media was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

19       b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner and/or others

with direct physical access to the computer.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.[10]   Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a digital device or other electronic storage media works can, after examining this forensic evidence in its proper context, draw conclusions about how the digital device or other electronic storage media were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device or other electronic storage media that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital

---

[10] For example, if the examination of a computer shows that:  a) at 11:00am, someone using the computer used an internet browser to log into a bank account in the name of John Doe; b) at 11:02am the internet browser was used to download child pornography; and c) at 11:05 am the internet browser was used to log into a social media account in the name of John Doe, an investigator may reasonably draw an inference that John Doe downloaded child pornography.

evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a digital device or other electronic storage media was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

86.     I know based on my training and experience that digital information can be very fragile and easily destroyed. Digital information can also be easily encrypted or obfuscated such that review of the evidence would be extremely difficult, and in some cases impossible. As outlined above, there is probable cause to believe that M. EARL uses encryption on the computer systems he utilizes to engage in his crimes. If an encrypted computer is either powered off or if the user has not entered the encryption password and logged onto the computer, it is likely that any information contained on the computer will be impossible to decipher. If the computer is powered on, however, and the user is already logged onto the computer, there is a much greater chance that the digital information can be extracted from the computer. This is because when the computer is on and in use, the password has already been entered and the data on the computer is accessible. However, giving the owner of the computer time to activate a digital security measure, pull the power cord from the computer, or even log off of the computer could result in a loss of digital information that could otherwise have been extracted from the computer.

87.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of premises for information that might be stored on digital devices or other electronic storage media often requires the seizure of the physical items and later off-site review consistent with the warrant. In lieu of removing all of these

items from the premises, it is sometimes possible to make an image copy of the data on the digital devices or other electronic storage media, onsite.  Generally speaking, imaging is the taking of a complete electronic picture of the device's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the item, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a. *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine the respective digital device and/or electronic storage media to obtain evidence.  Computer hard drives, digital devices and electronic storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. *Technical requirements*.  Digital devices or other electronic storage media can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises.  However, taking the items off-site and reviewing them in a controlled environment will allow examination with the proper tools and knowledge.

c. *Variety of forms of electronic media*.  Records sought under this warrant could be stored in a variety of electronic storage media formats and on a variety of digital devices that may require off-site reviewing with specialized forensic tools.

88.    Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit seizing, imaging, or otherwise copying digital devices or other electronic storage media that reasonably

appear capable of containing some or all of the data or items that fall within the scope of Attachment B to this Affidavit, and will specifically authorize a later review of the media or information consistent with the warrant.

89.     Consistent with the above, I hereby request the Court's permission to seize and/or obtain a forensic image of digital devices or other electronic storage media that reasonably appear capable of containing data or items that fall within the scope of Attachment B to this Affidavit, and to conduct off-site searches of the digital devices or other electronic storage media and/or forensic images, using the following procedures:

**1.  Processing the Search Sites and Securing the Data.**

a.  Upon securing the physical search site, the search team will conduct an initial review of any digital devices or other electronic storage media located at the subject premises described in Attachment A that are capable of containing data or items that fall within the scope of Attachment B to this Affidavit, to determine if it is possible to secure the data contained on these devices onsite in a reasonable amount of time and without jeopardizing the ability to accurately preserve the data.

b.  In order to examine the electronically stored information ("ESI") in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of any digital device or other electronic storage media that is capable of containing data or items that fall within the scope of Attachment B to this Affidavit.[1]

c.  A forensic image may be created of either a physical drive or a logical drive.  A physical drive is the actual physical hard drive that may be found in a typical computer.  When law enforcement creates a forensic image of a

---

[1]  The purpose of using specially trained computer forensic examiners to conduct the imaging of digital devices or other electronic storage media is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures.  When the investigative agent is a trained computer forensic examiner, it is not always necessary to separate these duties.  Computer forensic examiners often work closely with investigative personnel to assist investigators in their search for digital evidence.  Computer forensic examiners are needed because they generally have technological expertise that investigative agents do not possess.  Computer forensic examiners, however, often lack the factual and investigative expertise that an investigative agent may possess on any given case.  Therefore, it is often important that computer forensic examiners and investigative personnel work closely together.

physical drive, the image will contain every bit and byte on the physical drive. A logical drive, also known as a partition, is a dedicated area on a physical drive that may have a drive letter assigned (for example the c: and d: drives on a computer that actually contains only one physical hard drive). Therefore, creating an image of a logical drive does not include every bit and byte on the physical drive. Law enforcement will only create an image of physical or logical drives physically present on or within the subject device. Creating an image of the devices located at the search locations described in Attachment A will not result in access to any data physically located elsewhere. However, digital devices or other electronic storage media at the search locations described in Attachment A that have previously connected to devices at other locations may contain data from those other locations.

d. If based on their training and experience, and the resources available to them at the search site, the search team determines it is not practical to make an on-site image within a reasonable amount of time and without jeopardizing the ability to accurately preserve the data, then the digital devices or other electronic storage media will be seized and transported to an appropriate law enforcement laboratory to be forensically imaged and reviewed.

**2. Searching the Forensic Images.**

a. Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques. In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant. The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this affidavit. Those techniques, however, may necessarily expose many or all parts of a hard drive to human inspection in order to determine whether it contains evidence described by the warrant.

## <u>REQUEST FOR "ALL HOURS" EXECUTION</u>

90. As outlined in paragraph 28 above, surveillance and phone tracking data show that EARL and JOHNSON frequently leave one of the **Target Premises** before 6 a.m. together, likely to go to the gym. As also outlined above, both of these individuals

1  have active federal arrest warrants issued by the U.S. District Court in Atlanta.  That

2  means it may be necessary to execute the search warrant at their location outside of

3  normal daylight hours.  In addition, if EARL and JOHNSON are contacted before 6 a.m.,

4  they may have an opportunity to alert the other targets of this investigation (who also

5  have active arrest warrants).

6      91.    Accordingly, I respectfully request that the warrants to be issued allow

7  investigators to execute said warrants at any time of the day or night, as authorized by

8  Title 21, United States Code, Section 879.

9                          **CONCLUSION**

10     92.    For the foregoing reasons, I respectfully submit there is probable cause to

11  search the **Target Premises**, more particularly described in Attachment A hereto, for the

12  evidence described in Attachment B hereto.

13

14  _____
    Evan Leyva, Affiant

15  Special Agent, Drug Enforcement Administration

16

17     The above-named agent provided a sworn statement to the truth of the foregoing

18  affidavit by telephone on the 19th day of January, 2024.

19

20  _____
    The Honorable Brian A. Tsuchida

21  United States Magistrate Judge

22

23

24

25

26

27

Affidavit of SA Leyva - 42
WAW USAO # 2022R01345